## MOBILE & O. R. CO. *v.* STRAIN.

[88 South. 274, No. 21752.]

1. ADVERSE POSSESSION. *Adverse occupation of railroad right of way for ten years gives title.*

   Where a stranger in title to a railroad company obtains adverse, open, notorious, and exclusive possession of a part of its right of way and so occupies it for a period of ten years, claiming it as his own, he thereby obtains title by adverse possession.

2. ADVERSE POSSESSION. *User of railroad right of way and cultivation of garden under claim of title gives title after ten years.*

   Where the owner of property fences in a part of a railroad right of way immediately adjoining his property and continuously uses it and cultivates it as a garden, claiming title thereto, and has exclusive possession of it for a period of ten years, he acquired title thereto by adverse possession.

3. ADVERSE POSSESSION. *Permissive use of right of way personal, and permission ceases when permitted party sells his adjoining property in connection with which permission given.*

   Where the owner of a hotel by permission fences an adjoining lot which is a part of the right of way of a railroad company, this permissive use of the right of way is personal and ceases when the hotel is sold; and title by adverse possession may be obtained of this lot by remote grantees of the property by exclusive, open, notorious, and adverse possession thereof under claim of title for a period of ten years. This possession is constructive notice of their adverse claim to the railroad company.

4. ADVERSE POSSESSION. *Title may be obtained to part of railroad right of way not necessary to business as common carrier.*

   Section 184 of the Constitution of 1890 makes railroads public highways. Title by adverse possession may be acquired of a part of its right of way not in actual use, and not necessary for the transaction of its business as a common carrier.

APPEAL from chancery court of Lee county.

HON. A. J. McINTYRE, Chancellor.

Suit by the Mobile & Ohio Railroad Company against C. R. Strain. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*W. D. & J. R. Anderson,* for appellants.

We contend that under the undisputed facts and cir-
cumstances (being the agreed facts of this case) the claim
and possession of Strain and those thru whom he claims
title never began to be adverse in the true sense of the law
until the railroad company needed this property for rail-
road purposes, which the agreed facts show was only a very
short time before the bringing of this suit.

Here we have a case where, according to the agreed
facts, adverse possession began presumably "with the con-
sent of the Mobile & Ohio Railroad Company officials" and
it may be fairly and reasonably presumed (in fact we do
not see how it could be doubted) that Robertson fenced
up the garden and used it as a garden with the consent of
the officials of the railroad company, who were taking
their meals with him every few days.  The agreed facts
show that from that time up to shortly before the bringing
of this suit no official of the railroad company had any
actual knowledge of any adverse claim of this garden by
any owner of the Johnson Hotel property.

We say under the circumstances the holding and posses-
sion of Strain and those thru whom he claims title up to
the time this property was needed for railroad purposes
to build this industrial track on, was permissive and not
adverse and hostile.

Counsel on the other side contended in the court below,
and the court so held, that this question was settled ad-
versely to the railroad company by *Wilmot* v. *Y. & M. V.
R. R. Co.,* 75 Miss. 374 and *Paxton* v. *Y. & M. V. R. R. Co.,*
76 Miss. 536.

The language used by our court in these cases must be
confined to their facts.  In each of these cases the ques-
tion involved was whether title by adverse possession could
be acquired against the railroad to a part of its right of
way in the country, where the claimant of such title took
possession and cultivated the right of way in crops con-
tinuously for more than ten years claiming title thereto.

It is true that in both of these cases our court held that title by adverse possession could be acquired, but we call the attention of the court to some of the language used in each of those cases.  In the Paxton cases among other things the court said:  "The railroad company does not lose its title to the right of way by mere nonuser, and the running of the trains is a constant assertion and occupancy of its right of way to its full extent as granted, so as to preclude a loss of it except by strictly hostile possession of it for more than ten years."   (76 Miss. 537.)

In the Wilmot case among other things the court said: "Such occupancy by the owner of the fee must be strictly exclusive, and under distinct color of right, in order to bar the entry of the railroad company.  It should distinctly appear that the owner of the fee is not attempting to exercise his use of the land in harmony with the right of the railroad company, but his occupancy must be distinctly hostile to that of the company.  If the owner of the servient estate should cultivate any part of the right of way, under the notion that he was only enjoying a legal right not inconsistent with the use of the way by the company, such cultivation, however long continued, could not ripen into a title to the right of way or to the part so cultivated; but if he should fence a part of the right of way against the company itself, and claim, to the knowledge of the company, a right to use it as his own, discharged of servitude of the company, or under circumstances that necessarily gave the company notice of such claim, and should continue such possession for ten years, the company would be debarred of all right."   (76 Miss. 374.)

We call the attention of the court especially to the language of court in the Wilmot case to the effect that this claim of title and occupancy relied on must be distinctly hostile to the claim of the railroad company.

We say that we have no such case here.  We have here possession evidently beginning with the consent of the railroad company; and altho the agreed facts show that many

years afterwards such possession became adverse, still it is further shown that such adverse possession and claim was never brought to the attention of the railroad company until it needed this property for railroad purposes, which was only a very short time before this suit was brought.

We ask the court to consider the authorities on this proposition from the courts of other states. Under the deed from Reese to the railroad company, the latter had only an easement in the lot in controversy, for it is distinctly stipulated in his deed that the consideration was to build a depot house on said land. We believe under such circumstances that the great weight of authority is that title by adverse possession cannot be acquired until the railroad company has actual notice of the hostile claim. That any possession by another under such conditions is presumptively permissive and the statute of limitations does not begin to run until the railroad company needs the property for railroad purposes, and has actual notice of the hostile claim.

It may fairly be inferred from the agreed fact that Robertson bought the Johnson Hotel property and as an inducement thereto had an agreement and understanding with the officials of the railroad company that the railroad would patronize his hotel as a railroad eating house and that this agreement on the railroad's part was carried out soon after Robertson moved into the hotel building, and that during the period of time that he was clearly operating under this agreement with the railroad company he enclosed and cultivated the land in this controversy as a garden in connection with this hotel. This agreed fact in and of itself would naturally lead to the conclusion that in as much as the railroad was co-operating with Robertson in the conduct of the hotel business by furnishing the hotel with patronage from its trains, that this fencing up and using of the garden would necessarily carry with it the presumption that this plot of land was being fenced up and used by the consent and permission of the railroad company. The court will further note that

the agreed statement of facts say: "Presumably, this gar-
den was used in connection with the hotel, presumably
with the consent of the Mobile & Ohio Railroad officials."
This presumption which is agreed to as a part of the facts
in this case would necessarily continue throughout all
time until rebutted by some positive act on the part of the
possessor of said garden spot. The fact that it was fenced
does not come to the aid of appellee in support of his claim
of adverse possession for the reason that the agreed state-
ment of facts says that this fencing is presumed to have
been with the consent of the railroad, and the burden is
upon appellee to show such acts of adverse holding as
would in and of itself necessarily put the railroad company
upon notice that appellee's holding and that of his pred-
ecessors was adverse. We contend that the recitals in
the deeds of title that conveyance of the hotel property in-
cluded gardens, etc., is not such an act as would put notice
upon the railroad of adverse holding. The most that can
be contended by these recitals is that it would be con-
structive notice. This does not come up to the standard
of adverse holding required by the decision of the court in
the *Paxton* and *Wilmot cases, supra.*

In as much as the M. & O. Railroad Company had a deed
of record to the land in this controversy, it was not incum-
bent upon the railroad whenever the hotel property was
conveyed from one person to another to go and examine
the deed to ascertain whether or not it attempted to con-
vey any of its property. There is no presumption that
owners of property adjoining me in the sale thereof would
include my property, and there has never been a law that
would make it incumbent upon me to examine their deeds
for the protection of my own property. The railroad had
a right to presume that the conveyances of the hotel prop-
erty would convey the hotel property alone, and could not
be bound by any recitals in the deed attempting to convey
its property until it had actual notice thereof, and the fact
that the railroad company did not know that this garden
plot was being included in the different conveyances to the

hotel property is not evidence of negligence or laches on its part sufficient to estop it from asserting its right to the possession of this land.

To sustain this proposition we refer to the following authorities; Also 63 En. 745, 2 L. R. A. (N. S.) 272; *A. G. S. Ry. Co.* v. *McWhorter* (Ala.), 80 So. 839; *Dulin* v. *Ohio R. R. Co.* (W. Va.), 80 S. F. 145; *Roberts* v. *Sioux City R. R. Co.,* 73 Neb. 8, 102 N. W. 60, 10 Ann. Cas. 992, and Notes, 2 L. R. A. (N. S.) 272; *Louisville R. R. Co.* v. *Frank,* 100 Tenn. 209, 43 S. W. 771, 66 Am. St. Rep. 752; *Pritchard* v. *Lewis,* 125 Wis. 604, 104 N. W. 989, 110 Am. St. Rep. 873, 1 L. R. A. (N. S.) 565 and note; *So. Pac. Ry. Co.* v. *Hyatt,* 132 Cal. 240, 64 Pac. 272, 54 L. R. A. 522; *Mo. R. R. Co.* v. *Watson,* 74 Kan. 494, 87 Pac. 677, 14 L. R. A. (N. S.) 592; *McLucas* v. *St. Joseph R. R. Co.,* 67 Neb. 603, 93 N. W. 928, 97 N. W. 312, 2 Ann. Cas. 715 and notes.

*Sam H. Long,* for appellee.

This court is bound by the ruling of our supreme court in the case of *Wilmot* v. *Yazoo & Mississippi Valley Railroad Company,* 76 Miss. 374, and *Paxton* v. *Railroad Company,* 76 Miss. 536, in which the court held that adverse possession could run against a railroad in the usual manner and in the usual and customary mode of acquiring possession, etc., and this opinion as stated above, is in line with the best reasoning and majority of opinions of all the appellate courts of all the different states.

What notice is necessary against a railroad company? In the statement of facts in this cause, the complainant has set out in the agreement that no actual notice was ever given the Mobile & Ohio Railroad Company by any owner personally that they held this land adverse to the claim of the Mobile & Ohio Railroad Company. It would seem that counsel for complainant has been misled in believing that where the property of a railroad company is involved, that some extra form of notice or some special form of notice is necessary to put the railroad company on notice that the party in possession of their property holds it adversely and hostile to their interests, i. e., that some other means

besides enclosing it, putting improvements on it or living thereon and asserting title thereto, to the world, is necessary. We think counsel is entirely wrong in this contention or view, if he holds such, and would cite, to show as our reasons for thus stating what we think the law to be as in an exhaustive and a late note on the character of notice necessary to the railroad company of adverse possession to its property in 1917, Ann. Cas., page 1274. In the first part of this note, it is clearly stated to be the law that the usual and ordinary mode of taking possession, improving and enclosing and such kindred notices, are sufficient.

On an examination of the cases cited under the note to this case we find that each and every case cited under it has to do with the original grantor holding possession of the land after he has granted the right of way; or has to do with some of his heirs or grantees holding possession to the right of way, through his title, and does not involve the rights of any stranger to the land in any way, or that the right of way across the land, is an easement instead of being in fee simple and the courts generally hold in these cases, that the parties have the right to go on and use their land in any way they see fit, until it is necessary for the railroad to use their easement and that anything that is done, that is not inconsistent with the easement, will not be considered as notice to the railroad company that defeat their easement. For instance, *Dulin* v. *Ohio River Railroad Company*, cited above, in this brief, is also cited in this note, and same does not apply as it is cited under same, but decides that special acts have to be done, where the right of way is an easement across the land of party who asserts adverse possession to same. It has no effect upon the running of the statute against railroads whose rights of way are owned by them in fee, or where the contendor is a stranger to both estates.

Also in *Graham* v. *St. B. & S. F. R. R. Company* (cited in the note), is distinguished from the case at bar by the following language of the court: "The distinction between a vendor and a stranger in such a case relates to the char-

acter of evidence necessary to show the possession was ad-
verse.  If the parties are strangers in title, possession and
the exercise of acts of ownership are in themselves, in the
absence of explanatory evidence, proof that the holding is
adverse, where, if the vendor, after having executed deed,
continues to remain in possession, the natural and reason-
able inference, in the absence of evidence to the contrary
would be that he holds in recognition of the rights of the
person to whom he has conveyed; it not being supposed,
from mere acts of possession and ownership not inconsis-
tent with the rights of the vendee, that the vendee intends
to deny the title he has conveyed.  See also note in 1916 B.
L. R. A. 657.

I will attempt in the next division of my brief to apply
this law developed in division 1 and 2 to the facts in this
case.

It is contended, first, that the railroad company at the in-
ception had an easement merely in the land but a careful
reading of the deed from Reese to the railroad company
will show that he deeded them this land, not for the pur-
pose of putting a depot on same for the railroad company's
benefit but that in consideration of the railroad company
putting the depot on his land and near his property, he
was deeding them the land to have and to hold, etc.  There
is no reservation for depot purposes but the title to the
land was deeded in order to get a depot on it.  The court
can take judicial knowledge that this kind of a bargain is
frequently made by an ambitious landowner for a town-
site on his property where railroads are being constructed.

But if appellant is right in its contention and the deed
merely conveys an easement, appellee is not the holder of
the servient estate.  The deed to Robertson, the grantee,
through whom appellee claims were made to Robertson
and on record before the deed to the railroad company was
made and while truly they both hold from a common
grantor still the grantors through whom appellee claims
were strangers to the servient estate at the time the ease-
ment if any existed at all, was created.  Robertson's deed

is dated July 6, 1868, and recorded July 6, 1868, and the railroad company's is dated July 14, 1868, and recorded May 31, 1868.

So the principal of special notice by the owner of the servient estate to the owner of the easement or notice by acts not consistent with the easement before the statute can begin to run does not apply, as appellee and his grantors are strangers to the servient estate. It is next contended that because in the agreed statement of facts it is stated that the fence was put there in 1898 presumably with the consent of the railroad company, that this made it incumbent upon the appellee to show that at some time the appellee or his line of grantors had given special notice to the proper officials of appellant that they were going to hold the title adversely from thereon. In the first place this word "presumably" shows that there is no evidence either way and the fact that it is presumed shows that it is uncertain. Counsel for appellant contends that this presumption must be overcome by some special notice still the agreed state of facts are that and since 1891 and for about thirty years, Strain, the defendant, and those through whom he claims title to said Johnson Hotel property, have claimed this garden (which is the lot involved in this cause) as a part of said Johnson Hotel property; and have been in open and notorious adverse possession thereof claiming title thereto. The defendant, Strain, and his grantors since 1891, have not known that this complainant laid claim to the land involved in this cause.

So unless there is some grounds for special notice, such as the Railroad companys' title being an easement and being attacked by the grantees of said Reese, since the easement was created, then the notice necessary and the requirements necessary are the same as would be required against an individual and certainly nothing more strenuous would be required than thirty years open notorious possession claiming title. And if it is stated elsewhere in the statement of facts that the occupation was presumably started by consent, still if it is agreed later that for thirty years appellee and his grantees have been in open and

notorious possession claiming title, this of itself overcame the presumption.

The agreed statement of facts shows further that appellee and his grantors have included this garden in their deeds, one to the other, and place same on record since 1891 and that the man who deeded same in 1891 had owned it sixteen years and it can be fairly presumed that he had always considered it his and he acquired title just six years after the fence was put there which is another fact which tends to show that the occupation was not by sufferance at its inception.

All of these deeds were notice to the railroad company that the appellee and his grantors held the land adversely and considered it as their own. See cases entered in note to *Atlantic Coast Line Company* v. *Wades,* in 1917A, Ann. Cas., page 1276, 26 Ohio Circuit Court Report 44, said cases being *Smith* v. *Railroad Company* and *St. Louis & Santa Fe Railroad Company* v. *Ruttan,* 118 S. W. 705.

SYKES, J., delivered the opinion of the court.

The appellant railroad company by bill in the chancery court seeks to confirm its title and remove therefrom as a cloud thereon the alleged pretended claim of title of the oppellee, C. R. Strain, to a certain lot or piece of ground situated in the town of Tupelo. The answer of the defendant, Strain, denies the title of the complainant railroad company and claims title to this land because of the adverse, open, notorious, and continued possession of the land under claim of title by himself and his predecessors in title for a period of about thirty years. The case was tried on pleadings and an agreed statement of facts, and the bill of the complainant was dismissed, from which decree this appeal is prosecuted.

The uncontradicted facts shown by the record material to this decision are as follows: On July 7, 1868, Mayfield Reese sold to Samuel M. Robertson a certain lot in the city of Tupelo, designated as the Johnson Hotel property.

On the 14th day of the same month and year, or seven days after the Robertson conveyance, Mayfield Reese conveyed to the Mobile & Ohio Railroad Company certain lands within the city of Tupelo. The consideration recited in the deed was the building of a depot house by the railroad company on this land. The lot in controversy was a part of the land conveyed by Reese to the railroad company. It is situated immediately south of and adjoining the Johnson Hotel property. The depot is almost due west of the lot in controversy. The tracks of the railroad are between the depot, the Johnson Hotel property, and the lot in controversy. The hotel property and the lot in controversy are about fifty feet east of the main line track of the railroad company. It is agreed that the railroad company has a perfect record title to this lot and that Strain has no title to it, unless he has acquired it by adverse possession.

The record further shows that before the deed of conveyance from Reese to Robertson, under some sort of an agreement of purchase Robertson had erected upon this land a hotel and had made some arrangement with the officials of the railroad company for trains to stop at the hotel for meals, and this hotel was thus used for two or three years. A part of the agreement is as follows:

"No garden was inclosed and cultivated in connection with said hotel until 1868. In 1868 said Robertson, presumably with the consent of the Mobile & Ohio Railroad Company officials, many of whom took their meals at his hotel from time to time, inclosed the lot here in controversy just south of said hotel lot for a garden, since which time it has been continuously inclosed and used as a garden in connection with said hotel property. . . . The exact time in 1868 that said inclosures were made being unknown, but such inclosure was early enough to make a garden. . . . That the inclosure of the garden was by picket fence, and same remained in place for a period of forty-seven years, continuously, until the present structure was put there in 1915."

The agreement further states that before 1891, the deeds to the hotel property did not include the lot in controversy. Again:

"Since 1891 the deeds to said Johnson Hotel property in addition to describing the same as set out in the deed from Reese to Robertson, describe in varying language 'grounds, garden, stable lot, and attached lands belonging to said hotel.' "

Again: "The grantor of the Johnson Hotel property, who first made a deed and added to the description the language 'grounds, garden, stable lot, and attached lands belonging to said hotel,' had owned the Johnson Hotel property for sixteen years prior to 1891; and in making said conveyance he pointed out as a part of the Johnson Hotel property this particular garden adjoining said hotel property on the south which is the property involved in this cause. Said grantor pointed out said garden as a part of the land he intended to convey by his deed and which he claimed to own. This character of conveyance of said Johnson Hotel property has continued down to and including the conveyance to the defendant, Strain; and since 1891, and for about thirty years, Strain, the defendant, and those through whom he claims title to said Johnson Hotel property, have claimed this garden (which is the lot involved in this cause) as a part of said Johnson Hotel property, and have been in the open, notorious, adverse possession thereof claiming title thereto."

During the whole of the time from 1868, the grounds in controversy have been fenced and used as a garden by the owners of the hotel property. During all of this time various and sundry officials of this railroad company, including the president, have frequently visited Tupelo and had an opportunity of observing the continued open and notorious possession of this lot by the owners of the Johnson Hotel property. Since 1891 neither Strain nor his grantors have known that the railroad company laid claim to this lot. It is further agreed that during the time that Strain and those through whom he claims title had been

in possession of this property no official of the railroad
company having anything to do therewith had actual no-
tice of this claim and possession, and no other notice of it
than through the deed records of the county and the oppor-
tunity of notice through the visits of the officials of the
company to Tupelo; that the officials having anything to
do therewith had no occasion to look into the title of the
lot until just before this suit was brought, at which time
it was deemed advisable by the railroad company to build
a side track for a coal company over a part of this lot;
that this coal was to be shipped from other states to Tupelo,
and the track was to be built for the purpose of increas-
ing the interstate commerce of this railroad; that previous
to this time this lot had not been needed for railroad pur-
poses by the appellant company. The agreement also shows
that the appellant railroad was granted lands by the
United States for the purpose of building a railroad under
an act of Congress approved March 3, 1849 (9 Stat. 772),
and confirmed by the Mississippi legislature in 1852 (Laws
1852, chapter 1); that a large part of the appellant's side
tracks and branches are built on the lands above granted
by Congress and the state of Mississippi, but the particular
land in controversy in this cause was not included in said
grants; that none of the lands within the corporate limits
of Tupelo was acquired under the federal land grant.

It is the contention of the appellant that the holding
and possession of this lot by Strain and those through
whom he claims was not adverse and hostile until the time
the property was needed by the appellant company upon
which to build this side track; that up to this time this
possession was permissive. Appellant relies on this clause
of the contract, namely:

"In 1868 said Robertson, presumably with the consent
of the Mobile & Ohio Railroad Company officials, many of
whom took their meals at his hotel from time to time, in-
closed the lot here in controversy just south of said hotel
lot for a garden, since which time it has been continuously
inclosed and used as a garden in connection with said hotel
property."

This agreed statement of facts, however, further shows that this land continued to be used as a garden by all of the subsequent grantees of Robertson, and that the first grantor who included this garden in his deed in 1891 had been in possession of this property for sixteen years and pointed out this garden as a part of his property which he claimed to own. The agreement then recites that:

"This character of conveyance . . . . has continued down to and including the conveyance to the defendant Strain, and since 1891, and for about thirty years, Strain, the defendant, and those through whom he claims title, . . . have claimed this garden as a part of the said Johnson Hotel property, and have been in the open, notorious, adverse possession thereof, claiming title thereto"—and further that since 1891 Strain and his grantors have not known that the appellant company claimed title to this lot. From this agreement it is apparent that the appellee and his predecessors in title certainly from 1891 have exercised all of the rights of ownership possible to this lot. They have been in the exclusive, open, notorious possession thereof, claiming title. Their deeds to this lot were also on record. The only thing that could possibly have been done by them which was not done was actually notifying the appellant company through the proper officials of their claim to this property. The original possession of Robertson to this lot presumably with the permission of the railroad officials as to its duration is not shown. This permission, however, under this statement was purely a personal one to Robertson, and it cannot be presumed from this that his remote grantees were only exercising this permissive possession. Especially is this true in view of the fact that the party who sold the land in 1891, and who had been in possession of it since 1875, by deed included this land, and explained to his vendee that he owned it, and from 1891 to the present time these vendees both through their recorded deeds and their acts *in pais* have exercised the very highest degrees of ownership over this land that are susceptible of being so exercised.

While both the appellant and the appellee claim title through a common source, namely, Mayfield Reese, the Johnson Hotel property proper was first sold to Robertson before the railroad company purchased its lands. It is not necessary for us to decide whether the railroad company's deed from Reese was a fee-simple grant or merely an easement, as we are not here presented with a case of a grant to a railroad company of a right of way and a subsequent claim by the grantor or by those claiming under him of title by adverse possession to part of the right of way. The cases cited in the brief of the appellant upon this proposition are mostly cases of this latter character, an example of which is that of *Railroad Co.* v. *McWhorter,* an Alabama case, 202 Ala. 455, 80 So. 839. In that case there was a grant of an easement to the railroad company, and it was held that the possession of the grantor or his successors in title of a portion of the right of way not being actually used by the railroad could not be adverse to the railroad. In that case it was further held that the grantee of the easement could use the entire strip if necessary or proper for the purpose of the grant, but that it could not exclude the grantor, unless for such purposes. In this case the appellee is not claiming the lot in controversy through any grant from Reese; consequently he is a stranger to the title claimed by the railroad company. See, also, *Roberts* v. *Railroad Co.,* 73 Neb. 8, 102 N. W. 60, 2 L. R. A. (N. S.) 272, 10 Ann. Cas. 992. The decision in this latter case is briefly summed up in the concurring opinion wherein it is said that the occupancy of a portion of the right of way of the railroad company by the owner of the servient estate was not inconsistent with the easement.

In the case of *Graham* v. *Railroad Co.,* 69 Ark. 562, 65 S. W. 1048, 66 S. W. 344, it is stated that:

"The distinction between a vendor and a stranger in such a case relates to the character of evidence necessary to show that the possession was adverse. If the parties are strangers in title, possession and the exercise of acts

of ownership are, in themselves, in the absence of explana-
tory evidence, proof that the holding is adverse; whereas
if the vendor, after having executed deed, continues to re-
main in possession, the natural and reasonable inference,
in the absence of evidence to the contrary, would be that he
holds in recognition of the rights of the person to whom he
has conveyed."

This doctrine is approved in the case of *Railroad Co.* v.
*Ruttan,* 90 Ark. 178, 118 S. W. 705. See, also, note to case
of *Railroad.Co.* v. *Dawes,* Ann. Cas. 1917A, 1274.

In this state, contrary to the holdings in some of the
states to which reference has above been made, it has been
held that the owner of a servient estate can cultivate the
right of way only with the consent of the railroad com-
pany, and that the occupancy of the right by the railroad
is practically exclusive. *Wilmot* v. *Railroad,* 76 Miss. 374,
24 So. 701. It is further held in this case that the owner
of a servient estate may acquire title to parts of the right
of way by adverse possession. In that case it is held that:

"Such occupancy by the owner of the fee must be strictly
exclusive, and under distinct color of right, in order to bar
the entry of the railroad company. It should distinctly
appear that the owner of the fee is not attempting to ex-
ercise his use of the land in harmony with the right of the
railroad company, but his occupancy must be distinctly
hostile to that of the company."

It is also further said in speaking of the owner of the
fee: "But if he should fence a part of the right of way
against the company itself, and claim, to the knowledge of
the company, a right to use it as his own, discharged of
servitude of the company, or under circumstances that
necessarily gave the company notice of such claim, and
should continue such possession for 10 years, the company
would be debarred of all right." *Wilmot Case, supra.*

To the same effect is *Paxton* v. *Railroad Co.,* 76 Miss.
536, 24 So. 536.

Under the statement of facts in this case, the permissive
possession of Robertson of this lot being purely personal,

ceased when Robertson gave up possession of the hotel property and certainly since 1891 the appellee and his grantors through their open, notorious, exclusive, and adverse possession of this property claiming title thereto, together with their recorded deeds, was constructive notice to the appellant of this claim.

It is next contended by the appellant that title to this lot cannot be acquired by adverse possession for two reasons: First, because section 184 of the state Constitution provides that "all railroads which carry persons or property for hire shall be public highways, and all railroad companies so engaged shall be common carriers;" second, because this railroad company is what is termed a "federal land grant railroad," and under the act of Congress above referred to "the said railroad and branches shall be and remain a public highway, for the use of the government of the United States, free from toll or charge upon the transportation of property or troops of the United States;" that under this act it is also made a public highway charged with the duty of transporting free of charge property and troops of the United States.

First. Section 184 makes railroads public highways. There are, however, many differences between a railroad right of way and streets and public roads. The rights of the public to the use of the streets and public roads cannot be lost by adverse possession. *Whitherspoon* v. *Meridian,* 69 Miss. 288, 13 So. 843; *Briel* v. *City of Natchez,* 48 Miss. 423; *Vicksburg* v. *Marshall,* 59 Miss. 563. When a street or public road is used for purposes other than those to which the land is dedicated, the right of the people themselves, the right of the public generally, is affected by such use, and the people in such cases cannot be thus deprived of their rights. We do not think this rule is applicable, however, to a part of a railroad right of way which is not in actual use. The right of way, in a sense, is a public highway, and the land acquired therefor, either by purchase or condemnation proceedings, though devoted to a public use, is the private property of the railroad corpora-

tion. The officers of this company are not public officers. The objects and purposes of the corporation, though public in a sense, are also private; it is operated for gain, for the benefit of the stockholders. Streets and public highways belong to the sovereign or to the people; they are created for this purpose, and not for the private benefit of any individual or corporation. These differences are well expressed in the opinion of the Alabama Supreme Court in the case of *Warehouse & Storage Co.* v. *Railroad Co.,* 182 Ala. 516, 62 So. 745. Quoting from that opinion:

"Sovereign rights are not necessarily involved in the use of a portion of a railroad right of way for private purposes. While there might be, and sometimes is, such an obstruction of a railroad right of way as to constitute a public nuisance, the one in question is not such an obstruction or use. The wrong here complained of is private and not public."

Just as in the case at bar, for the proper operation of the railroad it is not necessary that it have possession of this lot, which is fifty feet from its main line track. The very fact that it has not used this lot since 1868 is conclusive of the fact that it is not necessary for the operation of the railroad.

To those lands of a railroad company not actually necessary for the operation of the railroad title by adverse possession may be acquired. The authorities in other states upon this question are divided, as may seem by reference to the following reports: Note in 87 Am. St. Rep. 766; 2 Ann. Cas. note, page 718; *Dulin* v. *Railroad Co.,* 73 W. Va. 166, 80 S. E. 145, L. R. A. 1916B, 653, Ann. Cas. 1916D, 1183, and note, note to the same case in L. R. A. 1916B, 657.

The questions decided in the Paxton and *Wilmot Cases, supra,* arose after the adoption of the Constitution of 1890, but it does not appear from the briefs of counsel or from the opinion of the court that section 184 of the Constitution was expressly called to the attention of the court.

Second. Since the lot in controversy was not acquired either through the United States or the state of Mississippi, but was purchased from a private individual, and since this lot is not necessary for the use of the railroad company in transporting the troops or property of the United States, the grant from the government or the tenure by which it holds title to these lands from the government or the state and whether or not title by adverse possession can be acquired as to any of these lands granted by the government or the state is not presented by this record.

The decree of the lower court is affirmed.

*Affirmed.*